JOHN LARSSON vs. METROPOLITAN STOCK EXCHANGE.

Suffolk.  November 9, 1908.— January 5, 1909.

Present: KNOWLTON, C. J., MORTON, HAMMOND, BRALEY, & RUGG, JJ.

*Release.  Deceit,* By conduct without words.  *Wagering Contracts.*

In an action, against a corporation called a stock exchange, under R. L. c. 99,
§§ 4–6, to recover money paid on margins on wagering contracts, the only de-
fense relied upon consisted of releases signed by the plaintiff, which the plaintiff
contended were obtained from him by fraud.  There was evidence that the
plaintiff was a foreigner, sixty years of age, who for many years had been em-
ployed as a coachman and was inexperienced in business, that each of the
releases was given in connection with the settlement of transactions between
the parties in which a balance was paid to the plaintiff for which he receipted,
signing his name at a shelf at the cashier's window, that the cashier placed on
the shelf the contract with a receipt upon it containing a statement of the
amount to be received by the plaintiff plainly written, while stamped also on
the back of the contract by a rubber stamp dimly in fine print was the release,
that the cashier in placing the paper before the plaintiff to sign put his hand
over a part of the matter that was stamped on it, and that the plaintiff "sup-
posed he was signing it for the money he got."  There was evidence in regard
to the manner in which the defendant conducted its business showing circum-
stances which the jury might find would lead the plaintiff naturally to believe
that on each occasion when he signed a release the defendant was presenting
a mere receipt for his signature.  *Held,* that, although no untrue words were
spoken to the plaintiff, there was evidence on which the jury might find that
the plaintiff was induced to sign the releases by wilfully false representations
made by the conduct of the defendant.

CONTRACT under R. L. c. 99, §§ 4–6, to recover money al-
leged to have been paid as margins upon wagering contracts for
the purchase and sale of stocks.  Writ dated October 8, 1903.

At the trial in the Superior Court before *Bishop,* J., the de-
fense relied upon consisted of the releases signed by the plain-
tiff which are described in the opinion, where also the material
portion of the instruction of the judge upon this subject is quoted.

The jury returned a verdict for the plaintiff in the sum of
$1,913.50, and the defendant alleged exceptions.

*G. F. Ordway,* for the defendant.

*O. Storer,* for the plaintiff.

KNOWLTON, C. J.  The only important question in this case
is whether there was evidence to warrant the finding that the

releases from the plaintiff, relied on by the defendant, were procured by fraud.

The action was brought, under the R. L. c. 99, §§ 4–6, to recover money alleged to have been paid by the plaintiff to the defendant as margins upon purchases and sales of stocks. It is conceded that the plaintiff's case would be made out, except for releases given by him to the defendant, covering the transactions relied on. The form of the releases is as follows:

<blockquote>
"Boston          190

"Received of the Metropolitan Stock Exchange —— dollars, in full of all demands under within contract, and I hereby release and discharge the Metropolitan Stock Exchange, its officers, agents and servants and each of them therefrom, and also from any and all right of action, claim or demand under or by virtue of chapter ninety-nine of the Revised Laws of Massachusetts, or any amendment thereof, for any payment at any time heretofore made, or value or anything at any time heretofore delivered, either on within or any other contract or transaction whatever, and I covenant never to sue therefor, them or either or any of them.

"Witness my hand and seal the day and year above written.

"$                                (L. S.)"
</blockquote>

These releases were given in connection with the settlement of particular transactions between the parties.

The business of the parties was done under contracts on printed blanks issued by the defendant to the plaintiff, in one form of which the defendant offered to deliver to the plaintiff certain stock, at a stated price, and the plaintiff agreed to receive it, or, upon the surrender of the contract by mutual consent, the defendant was to pay the plaintiff a sum equal to the then advance in the market price of the stock. There were stipulations as to deposits, and other terms of the contract, with columns for entries, headed "Margin," "Accountant's Signature," "Date of Deposit," and "Stock Order Limit." Another form of contract was similar, except that in it the defendant promised to receive from the plaintiff certain stock at a stated price.

When the plaintiff desired to close the contract in one of

these transactions the business was done in this way: The plaintiff applied to the cashier, who stood behind a small window with a little shelf eighteen inches wide in front of it, and told him he wanted to close the contract. After figuring the amount due him from his deposit, increased or diminished by the rise or fall in the price of the stock, the cashier placed the contract on the shelf at the window, with a receipt in the form quoted above on the back, in which the amount due the plaintiff was plainly written after the words: "Received of the Metropolitan Stock Exchange," and the same amount was plainly expressed in figures at the bottom, opposite the space for the plaintiff's signature. The body of the release, comprising all but the date and amount, was stamped on the back of the contract with a rubber stamp, in quite fine print, portions of which were very dim, and almost if not quite illegible to persons whose sight was not very keen. This was put before the plaintiff on the shelf for him to sign, and, upon his signing it, the amount of money named in it was paid him and the paper was retained by the cashier. The plaintiff testified that he only had the paper before him a moment, to sign, and did not read the release, but "supposed he was signing it for the money he got." The rubber stamp was put on the contract after the plaintiff asked to close it. He testified that he had to wait a while before they were ready for his signature, sometimes as long as ten minutes. He said that when he went to the window and wanted his money, the cashier would put the paper "out that way (illustrating by laying one of the contracts down on the shelf before him with his hand resting on it and covering part of the matter stamped thereon) for him to sign his name, and he would get the money if he signed his name."

The judge instructed the jury "that fraud is not mere misunderstanding, that it was not enough that a man should have signed one thing thinking it to be another, but that fraud is that circumvention, imposition and deceit, or getting around a man by words or acts fraudulent in their purpose, which operate as a deception upon his mind and entrap him; that a man is presumed to know the contents of what he signs; that fraud may be proved from acts and conduct as well as from declarations; and that deceit may take a negative form if it have the

characteristics and effect of actual misrepresentation, and left it to the jury to say whether effectual fraud was practised upon the plaintiff, and whether he signed the papers under such circumstances that he was induced to sign them under a belief that they were simply releases for the money he received, instead of releases of the statute right of action." The evidence of fraud in this case is not strong. No untrue words were spoken to the plaintiff, and it is a question by no means free from difficulty whether there was evidence of conduct, intended to deceive the plaintiff, which would naturally tend to mislead him, whereby he was fraudulently induced to sign these papers in the belief that they were merely receipts for money due him. If the defendant had told him that they were only receipts and he had signed the releases relying upon the statements, there is no doubt that he could have avoided them on the ground of fraud. *Trambly* v. *Ricard*, 130 Mass. 259. *Freedley* v. *French*, 154 Mass. 339. *Bliss* v. *New York Central & Hudson River Railroad*, 160 Mass. 447. In doing such business as this, where all the circumstances pointed only to the making of a receipt for the money paid, he would have been justified in taking the defendant's word, instead of waiting to attempt to decipher the dimly stamped words between the written statement of the amount at the beginning of the receipt and the figures giving the same amount at its end.

The first two cases cited above are applicable to facts like those now before us. Said Mr. Justice Colt in *Trambly* v. *Ricard*, at page 261, " The jury may well have found that the production of the writing at that time was in itself an affirmation on the part of the defendants that its terms did not differ from the terms of the sale agreed on. Fraud may be proved from the acts and conduct of a party quite as effectively as from his declarations. . . . And any act falsely intended to induce a party to believe in the existence of some other material fact, and having the effect to produce such a belief to his injury, is a fraud."

The transaction in which the parties were engaged when the paper was signed was one that called for the payment of money and the giving of a receipt. All that was said and done between the parties indicated that the paper to be given was a receipt,

and nothing more. At no time was there any reference to an arrangement or agreement which would justify the insertion of anything else than a receipt in the writing. The use of a stamp on the back of the contract might indicate to the plaintiff that he was signing a form of receipt which was regularly and properly used in all such transactions. The use of this stamp, taken in connection with the fact that the language impressed by it contained an important contract, about which nothing had been said and for which no consideration was given, and that the impression was difficult to read, might have another kind of significance. When we consider the manner in which the paper was presented for signature, and the plaintiff's lack of opportunity to read it unless he took it out from under the cashier's hand on the shelf and interrupted the regular method of doing the business, we see how the jury might have found a purpose, on the part of the defendant, to obtain the plaintiff's signature, without his knowledge that he was signing a release. The plaintiff was a Swede about sixty years of age, who had been employed many years as a coachman. The jury saw and heard him, and his counsel contends that they might have found him to be inexperienced in business and easy to be deceived. There were a variety of circumstances in the manner in which the defendant did this business, which the jury might find would naturally lead the plaintiff to believe on each occasion that the defendant was presenting a mere receipt for his signature, which circumstances were a representation by conduct that the paper was nothing but a receipt. They well might find that the plaintiff signed the paper in reliance upon this wilfully false representation.

We are of opinion that the case was properly submitted to the jury.

*Exceptions overruled.*